*In the United States District Court*
*for the Northern District of Illinois*
*Eastern Division*

| | |
|---|---|
| Justin D. Reed, | |
|     plaintiff, | |
| – v – | |
| Norfolk Southern Railway Company, a Virginia corporation, d/b/a Norfolk Southern Railway, | |
|     defendant. | **Jury demanded** |

# Complaint of Retaliation

## Nature of action

1.     This action concerns alleged retaliation in violation of the employee protections provisions of the Federal Rail Safety Act, 49 U.S.C. §20109.

## Parties

2.     Defendant is the Norfolk Southern Railway Company, a Virginia corporation, doing business as the Norfolk Southern Railway.

3.     Plaintiff is Justin D. Reed ("Mr. Reed").

## Defendant learns of Mr. Reed's possible on-the-job injury

4.     Defendant is a common carrier by rail and one of the four largest Class I carriers in the United States.

5.     Part of the work defendant needs done from time-to-time is changing out switch ties. "Switch ties" are railroad crossties of extra length for use at turnouts or crossovers. Switch ties weigh between 200 and 400 pounds, and changing them out is done using spike mauls, claw bars, 16-lb. sledge hammers, and a

hydraulic spiking gun (which weighs approximately 80 pounds and is similar to a jackhammer). Changing switch ties can be very strenuous work.

6. On or about April 29, 2009, defendant had assigned a work group called the "103 gang" to a location known as Control Point 518 on the south side of Chicago to change out switch ties. One of the workers defendant assigned that day to the 103 work gang to change switch ties was Mr. Reed.

7. Between 10:00 and 11:30 that morning, defendant's Trainee Supervisor Joe (last name unknown) heard from Mr. Reed that Mr. Reed was hurt and wanted to go to the hospital. Trainee Supervisor Joe asked Mr. Reed if he was serious, and Mr. Reed answered "yes". Trainee Supervisor Joe then told Mr. Reed that he would have to wait while he telephoned some higher officers.

8. Defendant's Track Supervisor Brooks telephoned Mr. Reed while Mr. Reed was waiting, asked Mr. Reed if he were really injured, and then said, "If I let you go back to the hotel and rest with pay, do you think it will get any better?" Mr. Reed responded, "No, I know what pain is. I worked with kidney stones last year". Supervisor Brooks tried for ten or fifteen minutes to change Mr. Reed's mind about going to the hospital, saying, "You know how this railroad is about their injuries".

9. Defendant's Assistant Division Engineer (Lloyd Brewer) then instructed Supervisor Joe to have Mr. Reed continue to wait until defendant's Assistant Supervisor (Bart Iskra) arrived. Once Assistant Supervisor Iskra arrived, Assistant Supervisor Iskra spent approximately two hours on the phone talking to other employees and put off Mr. Reed's request to go to the hospital by saying

that they would go "after I finish a few things". Eventually, Ralph Widener, a union representative, told Mr. Reed that defendant had no choice but to let him get medical care and directed Mr. Reed to tell Assistant Supervisor Iskra, "Let's go, it's been too long". Union representative Widener accompanied Mr. Reed to tell that to Assistant Supervisor Iskra.

10. Mr. Reed told Assistant Supervisor Iskra that he wanted to go to the closest hospital in Chicago, but Assistant Supervisor Iskra responded that upon Assistant Division Engineer Brewer's direct orders, "You have to go the Hammond Clinic in Indiana".

11. Although various hospitals, emergency rooms, and urgent care centers in Chicago are closer to where defendant was having Mr. Reed wait than was the Hammond Clinic in Indiana, defendant gave Mr. Reed no choice of what medical facility to go to other than going to the Hammond Clinic.

12. It took defendant's agents and Mr. Reed forty-five minutes to get from Control Point 518 to the Hammond Clinic.

13. Defendant contracts with the Hammond Clinic in Indiana to provide medical services to defendant's employees on an ongoing, fee-for-service basis. The allegations of this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation and/or discovery.

14. Defendant's Track Supervisor Gus Aranis met Assistant Supervisor Iskra and Mr. Reed at the Hammond Clinic. Track Supervisor Aranis asked Mr. Reed numerous inappropriate personal questions, attempting to intimidate Mr. Reed into falsely admitting that he had not been injured at work.

15. At the Hammond Clinic, Track Supervisor Gus Aranis and Assistant Supervisor Iskra filled out accident reports while Mr. Reed was waiting for medical care.

16. Also at the Hammond Clinic, defendant's agents attempted to go into the examining room with Mr. Reed and the doctor, but Mr. Reed requested and finally insisted that defendant's agents be excluded from the examining room, on the basis that medical matters should be private.

17. The Hammond Clinic had prepared standard work injury forms noting constant throbbing abdomen and groin pain under the heading "work related injury data", and "spiking with a spike gun" under "patient's description of injury". Once Mr. Reed was finally able to see the doctor, Mr. Reed told the doctor that he had pain in his abdominal area all the way down to his groin. The doctor checked Mr. Reed for hernias and said there were none. The doctor also obtained permission from Track Supervisor Aranis to perform a testicular ultrasound, which he did.

18. The doctor thereupon opined that Mr. Reed's pain was caused by a sexually-transmitted disease and was not work related.

19. Once Mr. Reed had thus been diagnosed with a non-work-related injury, Assistant Division Engineer Brewer instructed Track Supervisor Aranis to fax him all the paperwork from the Hammond Clinic. Assistant Division Engineer Brewer then telephoned Assistant Supervisor Iskra and asked to speak with Mr. Reed, telling Assistant Supervisor Iskra that Mr. Reed needed to "sign off" on the injury, because if he didn't, "it would take a very long time for [Mr. Reed] to get back to

work" and the "big bosses" would "look down on" Mr. Reed even if he did get back to work. By "signing off" Assistant Division Engineer Brewer meant that Mr. Reed would have to sign a statement that the condition or injury was not work-related.

20.     Defendant successfully intimidated Mr. Reed into signing off on the injury, faxing the form to Assistant Division Engineer Brewer's office in Chicago, and filling out a paper stating that he had not been "injured on or at work".

21.     Defendant's agents who had accompanied Mr. Reed to the Hammond Clinic responded to Mr. Reed's inquiry about returning to work by telling him that he could go back the next day, which would be April 30, 2009.

22.     Because Mr. Reed was in severe pain and was highly skeptical of the Hammond Clinic's diagnosis, Mr. Reed went to a hospital emergency room on or about April 30, 2009. At that hospital emergency room, the doctor, based on blood work done on and an ultrasound taken of Mr. Reed, both of which came back normal, determined that Mr. Reed had absolutely no signs of an infection caused by a sexually transmitted disease and diagnosed Mr. Reed with myofascial strain.

23.     Mr. Reed obtained further medical workups and had standard laboratory and other tests performed to confirm or rule out the Hammond Clinic's diagnosis of epididymitis caused by a sexually transmitted infection. All of these medical workups, laboratory tests, and other tests clearly indicated that Mr. Reed did not have epididymitis. Tests and visits to Mr. Reed's personal physician determined that while Mr. Reed's symptoms were idiopathic (i.e., without any identifiable

cause), they may have been due to a work-related strain to his abdominal and groin areas caused by heavy lifting.

24. Mr. Reed remained on medical leave for seven months, during which time he consulted and was tested by several medical specialists, none of whom could give Mr. Reed a definitive answer as to the cause of his condition. Mr. Reed improved, however, and he was released to return to work by December, 2009.

**Defendant fires Mr. Reed, supposedly for failing to report a work injury**

25. Mr. Reed was on medical leave from April 29, 2009, through the first week of December 2009, when he returned to work.

26. Approximately two months after Mr. Reed had returned to work, one of defendant's claims agent demanded to see Mr. Reed. At that point, Mr. Reed had not made any claim and did not want to make a claim.

27. Defendant's claims agent interrogated Mr. Reed for several hours as to whether Mr. Reed thought he had been injured at work. During that interrogation, Mr. Reed related that no doctor was really sure what had caused his condition — some doctors thought it was work-related strain and some did not — but when pressed repeatedly during the hours-long interrogation, and pushed as to what he himself thought, Mr. Reed said he thought the heavy work he had performed that day may have had something to do with his medical condition.

28. Defendant then charged Mr. Reed with failure to report a work injury and with giving "false and conflicting" statements regarding an injury.

29. On or about June 20, 2010, defendant fired Mr. Reed on the basis of these charges.

30. Defendant has a pattern and practice of retaliating against its employees who suffered an on-the-job injury or whom defendant suspects have suffered an on-the-job injury. The allegations of this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation and/or discovery.

31. Defendant did not honestly believe that the charges for which it supposedly fired Mr. Reed were true. The allegations of this paragraph are likely to have evidentiary support after a reasonable opportunity for further investigation and/or discovery.

**Retaliation in violation of the Federal Safety Act**

32. By the actions and omissions alleged, defendant retaliated against Mr. Reed in violation of the employee protections provisions of the Federal Rail Safety Act, 49 U.S.C. §20109.

**Damages**

33. As a proximate result of this retaliation, Mr. Reed lost his job, lost wages, lost employment benefits, and suffered pain and other damages.

34. To punish defendant for this retaliation in violation of the employee protections provisions of the Federal Rail Safety Act and to deter defendant and other railroads from future violations of the employee protections provisions of the Federal Rail Safety Act, exemplary damages should be awarded.

**Conditions precedent to filing this Federal Rail Safety Act claim**

35.   Mr. Reed has fulfilled all conditions precedent to the filing of this retaliation claim under the Federal Rail Safety Act. In October 2010, Mr. Reed timely filed an administrative claim with the Occupational Safety and Health Administration. On January 11, 2012, Mr. Reed gave 15-day notice of his intention to exercise his right to file a de novo action.

**Venue**

36.   Mr. Reed worked for defendant in the Northern District of Illinois, and this cause of action arose in that District. Venue is proper by §1391(b) of the Judicial Code [28 U.S.C. §1391(b)].

**Jurisdiction**

37.   This Court has jurisdiction under the Federal Rail Safety Act [49 U.S.C. §20109(d)(3)] and under §1331 of the Judicial Code [28 U.S.C. §1331].

*Wherefore*, plaintiff prays that this Court:

   a.   Order a settlement conference pursuant to Federal Rule of Civil Procedure 16 to assist him and defendant to settle this case;

   b.   Order defendant to reinstate Mr. Reed to his position (or a comparable position) with the same seniority status or, in the alternative, to pay Mr. Reed for a reasonable time into the future the compensation and benefits he would have earned in such a position;

   c.   Award Mr. Reed back pay, lost employment benefits, and other compensation lost to him as a result of defendant's having retaliated against him in violation of the Federal Rail Safety Act;

  d.  Award Mr. Reed prejudgment interest at the prevailing rate on the award of back pay, lost employment benefits, and other compensation lost to him as a result of defendant's retaliation;

  e.  Award Mr. Reed compensatory damages for the harm he suffered as a result of defendant's retaliation;

  f.  Award Mr. Reed exemplary damages under the Federal Rail Safety Act;

  g.  Award Mr. Reed his reasonable attorney's fees, expert witness fees, expenses, and costs of this action and of prior administrative actions; and

  h.  Award Mr. Reed such other relief as the Court deems appropriate.

Justin D. Reed,
plaintiff,

David L. Lee, ARDC #1604422
LAW OFFICES OF DAVID L. LEE
53 W. Jackson Blvd., Suite 505
Chicago, IL 60604
312-347-4400
d-lee@davidleelaw.com

By: _____s/David L. Lee_____
David L. Lee, one of his attorneys

Charles A. Collins (MN #17954)
CHARLES A. COLLINS, P.A.
410 Labor & Professional Center
411 Main Street
St. Paul, MN 55102
651-225-1125
chas@qwestoffice.net

Jeff R. Dingwall (CA #265432)
LAW OFFICE OF JEFF R. DINGWALL
750 West Fir Street, Suite 504
San Diego, CA 92101
619-796-3464
jeff@jrdingwall.com